PER CURIAM.
Keevis D. Watkins (“the father”) appeals a judgment of the Morgan Circuit Court (“the trial court”) granting a petition to establish paternity, custody, visitation, and child support that had been filed by Brianne Claire Lee (“the mother”) regarding the parties’ son and daughter (hereinafter referred to collectively as “the children”), who were born out of wedlock on October 12, 2007, and June 17, 2009, respectively.[1] The mother also has an older daughter from a different relationship (“the mother’s daughter”). On appeal, the father challenges only one aspect of the trial court’s judgment, namely, a provision permitting the mother to refuse the father’s visitation if she believes that he is under the influence of drugs or alcohol or that he is placing the children in an unsafe environment or a place of danger (“the refusal provision”). We affirm.
Background
The mother filed her verified petition on May 6, 2014. Acting pro se, the father answered the mother’s petition, and, after the trial court had ordered him to submit to genetic testing to establish his paternity of the children, the father later waived his right to undergo that testing and admitted his paternity; the trial court thereafter entered an order establishing the father’s paternity. After obtaining representation, the father filed an amended and verified answer and participated in discovery; however, the trial court later granted the father’s attorney’s motion to withdraw, and the father thereafter continued to defend against the mother’s petition pro se.
The trial court conducted a trial on April 5, 2016, at which the mother, the father, and a private investigator who had been hired by the mother’s attorney (“the private investigator”) testified. On May 4, 2016, the trial court entered a judgment awarding the mother sole physical and legal custody of the children and including, among other things, the refusal provision. Regarding the father’s visitation generally, the trial court stated: “The parties can mutually agree upon the visitation with the father, but if they cannot, the Morgan County visitation schedule ... shall govern.” With the assistance of a new attorney, the father then filed a “motion for a new trial” on May 25, 2016, in which he argued that the refusal provision could impermissibly allow the mother to with *86 hold visitation from the father based on her subjective beliefs that might not.be supported by “any real proof.” The trial court denied the father’s postjudgment motion on June 10, 2016, and the father filed a notice of appeal that same day.
Analysis
“‘“The trial court has broad discretion in determining the visitation rights of a noncustodial ■ parent, and its decision in this regard will not be reversed absent an abuse of discretion.”' Carr v. Broyles, 652 So.2d 299, 303 (Ala. Civ. App. 1994). In exercising its discretion over visitation matters,- “ ‘[t]he trial court is entrusted to balance the rights of the parents with the child’s best interests to fashion a visitation award that is tailored to the specific facts and circumstances of the individual case.’” Ratliff v. Ratliff, 5 So.3d 570, 586 (Ala. Civ. App. 2008)(quoting Nauditt v. Haddock, 882 So.2d 364, 367 (Ala. Civ. App. 2003)(plurality opinion)). A noncustodial parent generally enjoys “reasonable rights of visitation” with his or her children. Naylor v. Oden, 415 So.2d 1118, 1120 (Ala. Civ. App. 1982). However, those rights may be restricted in order to protect children from conduct, conditions, or circumstances surrounding their noncustodial parent that endanger the children’s health, safety, or well-being. See Ex parte Thompson, 51 So.3d 265, 272 (Ala. 2010)(“A trial court in establishing visitation privileges for a noncustodial parent must consider the best interests and welfare of the minor child and, where appropriate, as in this case, set conditions on visitation that protect the child.”). In fashioning the appropriate restrictions, out of respect for the public policy encouraging interaction between the noncustodial parents and their children,' see Ala. Code 1975, § 30-3-150 (addressing joint custody), and § 30-3-160 (addressing Alabama Parent-Child Relationship Protection Act), the trial court may. not use an overbroad restriction that does more than necessary to protect the children. See Smith v. Smith, 887 So.2d 257 (Ala. Civ. App. 2003), and Smith v. Smith, 599 So.2d 1182, 1187 (Ala. Civ. App. 1991).’
“[Pratt v. Pratt,] 56 So.3d [638,] 641 [ (Ala. Civ. App. 2010) ].”
B.F.G. v. C.N.L., 204 So.3d 399, 404-05 (Ala. Civ. App. 2016).
As mentioned above, the father argues only that the trial court abused its discretion by including the refusal provision in its judgment without specifically defining the circumstances under which the mother can withhold visitation' from the father. The only case the father has- cited in the argument section of his appellate brief is H.H.J. v. K.T.J., 114 So.3d 36 (Ala. Civ. App. 2012), in which this court reversed a particular portion of a trial . court’s judgment that had effectively permitted a child to decide whether his father could exercise visitation. Noting that “the father ha[d] made some efforts to repair his, relationship with the child, that the child was responding, and that the child was willing to try to have a relationship with the father,” we concluded that “[ajllowing the child to determine the timing of visitation with the father would not, given the facts, be in the child’s best interests.” Id. at 44.
In response, the mother asserts the following in her appellate brief:
•“[The mother] understands that visitation with the [fjather is a fundamental right to the [f]ather, However, the [trial c]ourt can have restrictions on visitation but those restrictions must be tailored to *87 meet the child’s interests. Jackson v. Jackson, 999 So.2d 488 (Ala. Civ. App. 2007). The [c]ourts have allowed restrictions if the parent’s conduct would endanger the child, if the parent has a history of neglecting or ignoring the child, violations of prior court orders regarding visitation or other good reasons relating to the welfare of the child may justify restrictions on the parent’s visitation with his or her child. [1 Judith S. Crittenden & Charles P. Kindregan, Jr.,] Alabama Family Law[ § 13:3] (2016).”
In its judgment, the trial court set out specific findings “as to why joint custody should not be granted,” several of which could also have been relevant to its inclusion of the refusal provision:
“(d) There is a history of domestic violence in the parties’ home when they lived together.
“(e) There is a potential for kidnapping with respect to the father’s threat of moving ‘far, far away’ and the. father’s checking the children out of school without notifying the mother regardless of who is exercising visitation at that time. «
“(g) The father’s testimony before this court revealed he was more interested in his needs and wants than he was in the children’s welfare.”
The refusal provision specifically provides:
“The mother has the right to refuse visitation of the father if, in her judgment, (1) the father appears to be under the influence of drugs or alcohol, or (2) the father appears to be placing the children in an unsafe environment or to be placing them in a place of danger.”
As previously stated, the father appeared pro se at the trial. After the mother had presented her..case-in-chief, the trial court allowed the father to testify regarding any matter that he wished to address; much of the mother’s testimony was generally disputed by him. The .mother testified that she and the father had lived together from 2007 until 2013. Before they had begun living together, the father had been convicted of selling cocaine and had been incarcerated for two years. Regarding the children’s health and safety while in the father’s care, the mother specifically testified regarding a burn that the son had suffered on his arm and provided photographic evidence of the injury. She also noted that she had requested and obtained a pendente lite order from the trial court preventing the father from taking the children from Alabama. She offered the following explanation for that request:
“[The mother]: ... I had picked [the children] up from school one day, and the principal came to my car and asked if we were moving. I said, no, I’m not moving. I said, their dad might be moving. And they told me that [the son] told his teacher that he was moving far, far away. So I told the principal, no, they’re not leaving this school. We drove off and I asked [the son] T said, why did you tell your teacher that, and hé said that his dad told him that they were moving and he wasn’t going to go to that school any longer.”
The mother further testified that, while the parties were living together, there had been several incidents of domestic violence between her and the father and that the police had been involved “several times.” During the father’s cross-examination of the mother, the following exchange took place between the mother and the trial court:
“[The trial court]: ... The question is, why do you think he’s not a good father?
“[The mother]: The lifestyle he lives.
“[The trial court]: Which involves?
*88 “[The mother]: Hanging out, he acts like [the son] is his homeboy, and they ride around the streets. He has done drugs in the past. I am going to say I believe he still smokes marijuana and drinks. Yeah, I might have an occasional drink, but I don’t drink to the extent he does. The people he hangs out with I feel like are not people my kids need to be around.”
The father also offered the following relevant testimony upon direct examination by the mother’s attorney:
“[The father]: When I got out of prison I went to Texas and helped them move back to Decatur, Alabama and resided because [the mother] had told me that [the mother’s daughter] was mine. I became a man, stepped up, and I raised her until she became 12 years old, and on her 12th birthday [the mother] came to me and said I have something to tell you. [She] is not yours. That’s when everything started going downhill, you know, with the fighting and arguing. I was hurt. You raise a kid for so long and all of a sudden one day everything is tooken from you. How you going to feel? You going to be happy about that situation when nobody never told you thank you, I appreciate it. First thing out of her daughter’s mouth is[:] You ain’t my daddy no more. You ain’t got to do to this, you ain’t got to do that. That hurt me. That’s where a lot of that domestic violence comes in. We argued a lot about it. I drunk pretty heavily about it because I was hurt. I was trying to find comfort. I drunk real heavy when this happened.
“[The mother’s attorney]: Used marijuana?
“[The father]: Back when I was in my— before I went to prison.
“[The mother’s attorney]: Did you use marijuana when you were with [the mother]?
“[The father]: No, ma’am, I didn’t. I drunk. I drunk beer. I managed the girl’s softball for seven years.”
The father also offered the following relevant testimony during his ease-in-chief:
“[The father]: And I—not only am I going to hurt if I can’t continue to see my kids, my kids are going to hurt, you know, because they used to us sitting in the park all day. It hurt, man. You know, to sit up here and after I have to sit here and fight for your kids and you know what you do. I’m going to hold back, and I ain’t going to sit here and cry. I’m going to try not to but it hurts, you know, to sit here and have to ....
“[The father on learning that the mother’s daughter was not his child]: You know, years ago I couldn’t talk about it when it happened but now I’m able to talk about it, but it hurts a little bit. But I can’t let it keep me down because I’ve got two that I got to keep going for. That’s all. I just don’t want my kids tooken from me. ii
“[The father]: I’m going to tell you the truth. I don’t know what’s going to happen if you take my kids from me, you know, because they’re my world.
“[The mother’s attorney]: I assume you deny using any drugs in your home since you’ve had custody of the children?
“[The father]: Correct.”
Finally, the private investigator testified that he had smelled “a strong odor of marijuana emitting from the inside the [father’s] apartment” when he had served him with the mother’s petition in May 2014. He stated that he had recognized the *89 odor from his “years of law enforcement.” When asked during cross-examination by the father whether the smell could have been emanating from a different apartment, the private investigator testified that he did not believe so “[b]ecause the odor was strong enough to be coming from the door right there where [he] approached it.”[2]
In light of the evidence presented regarding the parties’ history of domestic violence, the father’s past exposure to drugs, the incident in which the son had been burned, the possibility that, the father had planned to relocate with the children, the manner in which the father had treated the son, and the father’s recent marijuana use, the trial court could have reasonably concluded that, based on the particular facts and circumstances of this case, including the refusal provision in its judgment was a narrowly tailored means of preserving the father’s rights and serving children’s best interests by protecting their health and safety. We also note, however, that the trial court’s conclusion could have also been based, in part, on the father’s testimony regarding the manner in which he had reacted to learning that the mother’s daughter was not his child, namely, that he had begun to drink alcohol heavily and that doing so had contributed to domestic violence between the parties. The father’s testimony would support the conclusion that he cares a great deal about the children and that an award of sole physical custody to the mother might also deeply affect him emotionally. The trial court could have therefore intended for the refusal provision to provide additional protection for the children in the event that the father began to abuse alcohol. In light of the evidence presented, we cannot conclude that the trial court’s determination in that regard was unreasonable.
In his appellate brief, the father expresses concern that the refusal provision could allow the mother to withhold his visitation if she is “mistaken, or vindictive.” He also contends that she is now the “sole determiner of visitation” and asserts that he “has no say so on this, neither does the [c]ourt system.” We first note that the trial court’s judgment allowed the parties to reach an agreement regarding the father's visitation and, if they are unable to, do so, provided scheduled visitation for the' father. Thus, we reject his contention that the mother has been delegated with absolute authority to determine his visitation. Second, we note that the mother testified that she wanted the father to have regular visitation and that no evidence was presented indicating that she would vindictive-' ly withhold visitation from him. Therefore, the father’s concerns in that regard are speculative in nature, and the trial court would be the proper forum to address such concerns if and when they come to fruition.
The dissent concludes that the refusal provision violates the father’s visitation rights and cites Ex parte Thompson, 51 So.3d 265, 272 (Ala. 2010); Hardy v. Weathers, 56 So.3d 634, 635 (Ala. Civ. App. 2010); Pratt v. Pratt, 56 So.3d 638, 643 (Ala. Civ. App. 2010); Carr v. Broyles, 652 So.2d 299, 303 (Ala. Civ. App. 1994); Naylor v. Oden, 415 So.2d 1118, 1120 (Ala. Civ. App. 1982); and In re A.L.E., 279 S.W.3d 424, 427 (Tex. App. 2009), in support of its position. '
*90 However, as noted above, and despite their relevance to his appeal, the father, has not preferred this court to any of the authorities upon which the dissent relies in reaching its conclusion. Indeed, the father has not' cited any authority discussing limitations on a custodial parent’s discretion to deny a noncustodial parent’s visitation. Inasmuch as the father relies upon H.H.J., supra, for the proposition that a court cannot vest a custodial parent with the power to be the “sole determiner” of visitation, we note that H.H.J. does not stand-for-that proposition because that issue was not before this court in that case. See Ex parte Professional Bus. Owners Ass’n Workers’ Comp. Fund, 867 So.2d 1099, 1101 (Ala. 2003)(“Generally, an appellate court is limited .to considering only those issues raised on appeal.”).
“‘It is not the function of the appellate courts to develop, research, and support an appellant’s arguments.’ ” Knight v. Knight, 214 So. 3d 1207, 1210 (Ala. Civ. App. 2016)(quoting M.F. v. W.W., 144 So.3d 366, 368 (Ala. Civ. App. 2013)). Furthermore,
“[i]n the absence of an argument supported by legal authority, an alleged error of law committed by a trial court is' considered ‘essentially unchallenged on appeal.’ [Walden v. Hutchinson, 987 So.2d 1109, 1120 (Ala. 2007)]. An appellant waives .the right-to appellate review of a ruling on a question of law when the appellant fails to cite any legal authority on that point as required by. Rule 28(a)(10), Ala. R. App. P. Slack v. Stream, 988 So.2d 516, 533-34 (Ala. 2008). This court cannot cure that deficiency by creating legal arguments for the appellant, see Spradlin v. Spradlin, 601 So.2d 76, 78-79 (Ala. 1992), because it is not the function of this court to perform an appellant’s legal research. City of Birmingham v. Business Realty Inv. Co., 722 So.2d 747, 752 (Ala. 1998).”
State v. Pressley, 100 So.3d 1058, 1070-71 (Ala. Civ. App. 2012)(Moore, J., dissenting). Thus, we are not inclined to reverse the trial court’s judgmént based on the authority provided by the dissent.
AFFIRMED.
Thompson, P.J., and Pittman and Donaldson, JJ., concur.
Thomas, J., concurs specially.
Moore, J., dissents.

. See Ex parte F.T.G., 199 So.3d 82, 86 (Ala. Civ. App. 2015)(“[U]nder present law, juvenile courts, district courts, and circuit courts have concurrent jurisdiction to adjudicate issues of parentage and to adjudicate issues of custody, visitation, and child support incidental to an adjudication of parentage.”).

. The father implies that the private investigator’s testimony should be disregarded be-, cause, the father asserts, he was an "unqualified expert.” However, the father does not cite any authority or otherwise develop a meaningful argument in support of that implication. "When an appellant fails to properly argue an issue, that issue is waived and will not be considered.” Asam v. Devereaux, 686 So.2d 1222, 1224 (Ala. Civ. App. 1996).